[No. 18530.　Department Two.　November 20, 1924.]

LLOYD GARRETSON *et al., Respondents,* v. EDWARD
PARKER *et al., Appellants.*[1]

LANDLORD AND TENANT (15)—LEASE—CONSTRUCTION—CROPS—DE-
DUCTION OF EXPENSES AND CHARGES. A tenant on shares was entitled
in an accounting, to credit for all his expenses, under a lease of
orchard and other lands which provided, in one clause, that at his
"own cost and expense" he should care for the fruit trees and
furnish all teams, tools, material and labor necessary for that
purpose, where other clauses required him to keep an account of all
expenses and proceeds of all crops, and referred to the "net in-
come" therefrom; especially in view of such a construction which
the parties, with access to the accounts, contemporaneously placed
on the lease.

ACCOUNT (14)—ACTION FOR—CREDITS AND CHARGES—EVIDENCE—
SUFFICIENCY. Findings, upon an accounting, of good husbandry by
a tenant on shares, are not sustained by the evidence, and the credits
allowed should be reduced by allowing the lessor increased offsets,
where it appears that, for two years, crops of hay measured in the
stacks at 240 and 250 tons, and that the same were left exposed until
winter, when but 130 and 140 tons was found marketable and fit to
be baled.

Appeal from a judgment of the superior court for
Yakima county, Nichoson, J., entered June 6, 1923, in
favor of the plaintiff, in an action for equitable relief,
tried to the court. Modified.

*John C. Eversole* and *Parker, La Berge & Parker,*
for appellants.

*Richards, Gilbert & Fontaine* and *S. F. McAnally,*
for respondents.

FULLERTON, J.—On February 18, 1918, the appel-
lants, Edward Parker and Julia A. Parker, being then
the owners of a tract of land situated in Yakima county,
containing approximately seventy acres, leased the
same to the Pacific Fruit & Produce Company, a cor-

[1]Reported in 230 Pac. 139.

poration doing business in the county named, "for a term of three years from the 1st day of May, 1918, provided that said period may be extended upon the conditions and terms hereinafter expressed." The lease contained the following stipulations (the lessors being meant by the term "parties of the first part," and the lessee by the term "party of the second part"):

"The party of the second part shall have possession of said land from and after the said 1st day of March, 1918; they shall at their own costs and expense in a husbandlike manner and proper manner prune, spray, irrigate and care for all fruit trees now growing upon said premises, and furnishing all teams, tools, material and labor necessary for that purpose, and the spraying of said fruit trees shall be done in accordance with the horticultural laws of the state of Washington, now in force, or hereafter enacted.

"The party of the second part shall also do all work that is necessary to be done to care for and keep all lateral ditches leading water to and distributing water over said premises for irrigation, in repair. They shall cultivate that portion of said land which is not in fruit trees, to such crops as they may desire to cultivate thereon, and shall have the privilege of plowing up not to exceed four acres of the said land which is now planted to alfalfa, and to cultivate the same in such crops as they may desire to cultivate on the said land not now in fruit trees, including the four acres of alfalfa to be plowed up as herein provided.

"The said land shall be cultivated under the direction of John C. Koreski, or some other practical farmer, and the parties of the first part, and the party of the second part, shall, from time to time, confer as to the manner and method of cultivating said land and handling said fruit trees, and in case of any disagreement between the parties hereto as to the proper method of handling, spraying and caring for such fruit trees, the said matter upon which a disagreement arises, shall be submitted by the parties hereto to the

horticultural inspector of Yakima county then in office, and the decision of such horticultural inspector upon any question, upon which there is a dispute, shall be final and binding on all parties hereto.

"The party of the second part shall pay as rental for said premises, for the year 1918, the sum of $2,000, said sum to be paid on the 1st day of March, 1918. For the year 1919, the party of the second part shall pay as rental for said premises the sum of $2,500, said sum of $2,500 to be paid on or before the 1st day of March, 1919; for the year 1920, the party of the second part shall pay as rental for said premises the sum of $3,000, said sum to be paid on or before the 1st day of March, 1920. The party of the second part shall cause said land to be cultivated, the crops harvested and the produce thereof handled and marketed in an economical and husbandlike manner, and shall keep an accurate account of all costs and amounts expended by them in and about the cultivating and handling of said land, and the crops therefrom, and the prices received for the crops therefrom, which account shall, during all business hours, be accessible to the parties of the first part, their agent or attorney, for the purpose of examination.

"It is agreed that this contract and as a part of the consideration is based upon a net income from said premises for the year 1918, of not less than $1,200.00 and upon the basis of net income from said premises for the year 1919, and the year 1920, of at least $5,000.00 each of said two years, and if the party of the second part does not receive a net income from said premises for said three years of at least $11,200 they will have the use of said premises for such an additional period after the expiration of said three years as will enable them to receive from said premises a net income of $11,200.00, and if the party of the second part becomes entitled to the use and possession of said premises for any additional period over said three years, to make up the income of $11,200.00 after the income from said premises has exceeded $11,200, then any excess of net income above $11,200 received by the party of the second part, shall be divided equally

between the parties hereto, each receiving one half thereof. And it is further understood that if the party of the second part is required to advance or upon the request of the parties of the first part does advance any sum or sums for the protection of said leased premises, against any lien or liens, against or upon said premises, such sum or sums which may be so advanced shall be considered a part of the operating expenses for the year or years in which such advance is made.

"The parties of the first part shall furnish with said premises the water rights to which said land is entitled in the Tieton Reclamation Project, and shall pay the amount charged by said reclamation project for the irrigation of said land, up to but not exceeding 2.17 acre feet per acre of irrigable land. The party of the second part shall pay any amount charged by the said reclamation project for water used in excess of the said quantity, which excess amount so paid shall be considered as a part of the costs of producing the crops for the year in which such excess water shall be used, but such amount paid for excess water shall not be charged against the parties of the first part in any other way or manner.

"It is agreed and understood that the time of making said payments, and the faithful performance of all the acts and things to be done and performed as herein provided, are of the essence of this contract, and a material part thereof, and that that should the party of the second part fail to make said payments or either of them, when the same become due, or should fail to do and perform any act or thing by it to be done and performed, as herein provided, or if it should permit waste upon said premises, or unnecessarily injure the same, the parties of the first part may, upon such failure or commission of waste or injury, re-enter said premises, remove the party of the second part therefrom, and all obligations of every kind and character under the terms of this contract, shall, upon such failure, cease, and be terminated, and the parties of the first part may retain any amount theretofore paid on account of said rental, and it is agreed that if any

dispute arises between the parties hereto as to whether there has been a performance of said contract, in accordance herewith, each party hereto shall select one disinterested, competent man, the two thus selected, in case they are unable to agree, shall select a third, and the decision of the three men thus selected, or a majority of them, shall be final and binding upon all parties hereto, and each party hereto shall pay one-half of the costs of such arbitration.

''The land above described contains a valuable young orchard and this contract is based upon the personal trust and confidence which the parties of the first part have in the party of the second part, and its ability, knowledge and good faith in handling said orchard to the best advantage, and this contract therefor shall not be assigned or transferred, or said premises or any part thereof sublet without the consent of the parties of the first part in writing being first had and obtained to such assignment and transfer or subletting, and any attempt to sublet said premises or assign or transfer this contract, shall be sufficient cause, at the option of the parties of the first part, to cancel and terminate this contract.

''It is agreed and understood by the parties hereto that the second party may, at its option, terminate this contract after the end of any crop season, by giving the parties of the first part notice in writing prior to February 1st, of the succeeding year of their intention to so terminate same.''

On February 18, 1919, the lease, with the consent of the lessors, was transferred by the original lessee to Lloyd Garretson, the respondent in the present action.

The principal orchard mentioned in the lease was an apple orchard, some thirty-six acres in extent, located on the east half of the tract. On October 1, 1920, the lessors, with the consent of Garretson, sold 18.67 acres of the land to one Roberts. Within the description of the tract sold were some seventeen acres of the orchard mentioned. A part of the agreed purchase price, $17,000, was not paid at the time of the sale. For

this part the grantors took the promissory notes of the purchaser, secured by a mortgage on the tract conveyed. These notes were six in number, five for $3,000 each and one for $2,000, and were payable one in each year for six successive years from the date of the sale. At the time of the transaction, the purchaser and the grantors entered into an agreement which, after reciting the sale and the fact that a part of the purchase price had been secured by mortgage, contained the following stipulations:

"And whereas, said mortgagees consider it advisable to retain some control over said mortgaged premises until the first two notes have been paid as additional security. .

"Now therefore, it is hereby agreed by and between the parties hereto as follows:

"Said Edward Parker does hereby agree to negotiate for a lease of said premises to some horticulturist, either upon a cash or crop basis, and upon such terms and conditions as he may deem advisable, said lease to be for the term of one year only, provided that if said lease is for cash, the amount of rental reserved shall be subject to the approval of said John E. Roberts, and that if said rental is for shares that the share of said crop reserved to the said John E. Roberts and wife shall not · be less than one-half thereof, and that all picking, packing, crating, sorting and boxing shall be paid for by the tenant, and that said John E. Roberts and wife agree to pay for all materials including boxes, nails and paper used in the care of their share of the crop, and said John E. Roberts and wife do hereby agree to execute a lease with such person upon the above terms or such better terms as may be secured by the said Edward Parker.     .     .

"It is further understood and agreed that similar arrangements shall be effected for each year until the first two promissory notes due to said mortgagee have been paid, provided, however, that no lease shall be entered into for more than one year at a time.

"It is further agreed and understood that all net proceeds to be received by said first parties under said lease shall be paid to said Julia A. Parker to be applied upon said mortgage indebtedness in addition to the payments to be paid for that year in accordance with the notes which said mortgage secures, it being the intention that said Three Thousand Dollars ($3,000.00) note which becomes due in 1921 shall be paid in addition to such crop payment, and it is further agreed that when said first two notes for Three Thousand Dollars ($3,000.00) are paid, together with all interest on said mortgage indebtedness, that this agreement shall cease and no longer be in force and effect."

At the time of the sale of the tract to Roberts, the lessors entered into a further agreement with the lessee, Garretson. This agreement, after reciting the release of the property sold to Roberts, contained further recitals, together with the terms of the agreement, in the following language:

"And whereas, said release was made for the purpose of permitting said lessors to dispose of all said property to one John E. Roberts, and said lessors have disposed of said property to said John E. Roberts, taking a first mortgage upon said premises, together with an agreement that the net proceeds of the crops to be grown during the years 1921 and 1922 shall be applied by said John E. Roberts towards the payment of said mortgage indebtedness due first parties.

"And whereas, it is at the present time doubtful whether the guarantee of said first parties in connection with the said lease will have been lived up to when a settlement shall have been made by the parties hereto after the disposal by said second parties of the crops grown upon said leased premises during the year of 1920.

"Now, therefore, in consideration of the premises, said first parties do hereby agree that in the event that said guarantee shall not have been performed by them at the end of the term of said lease, that they

will assign or set over to said second party all interest
or right which they may become entitled to in and to
the proceeds of the crops for the years 1921 and 1922
upon said John E. Roberts premises, as security for
the performance by said first parties of said guarantee.
First parties further agree in such event to execute
whatever papers or agreements second party may
deem necessary to properly transfer said interest in
said crop returns to him so that the same may be prop-
erly held by him as collateral security for the faithful
performance on the part of the first parties of said
guarantee.''

In their consideration of the questions at issue, both
parties have treated Garretson as the original lessee.
Looking at the record from the same point of view,
it appears that Garretson entered into possession of
the premises shortly after the execution of the lease;
that he continued in such possession until the time of
the trial of the present action, which was had in March,
1923; and that during this period he bore the expense
of farming the premises and received and disposed of
the crops grown thereon. He paid the rentals called
for by the terms of the lease; that is to say, the rentals
for the years 1918, 1919, and 1920, but paid nothing by
way of rental for the years 1921 and 1922. His ac-
count shows that, during this period, he has had a net
return from the produce of the premises over and
above the expenses, including the rental, according to
the findings of the trial court, of $670.35.

The present action was instituted in August, 1922.
At that time a dispute had arisen between the lessors
and the lessee as to the then state of the account be-
tween the parties. Garretson claimed that he had suf-
fered a loss in his farming operations of $1,629.69,
and that there was then owing him this sum, together
with the sum of $11,200 he was entitled to receive as
profits by the terms of the contract. He further con-

tended that he was entitled to have credited thereon the payments made by Roberts on the mortgage notes given for the purchase price of the land sold to him. His claims were disputed by the lessors, and the purpose of the action was to establish the account and to secure the payment thereon of the amount paid by Roberts on the notes. To the complaint, the plaintiff attached a statement of the receipts and expenditures from the premises, showing a loss in the sum before stated. Before the trial of the action, he supplemented the complaint by a statement of the expenditures and receipts for the year 1922, which changed the deficit into the profit. The lessors answered, denying that the account submitted was a correct account, and averring affirmatively that the expenses charged were grossly excessive, that the premises had not been properly cared for or tilled, that a large part of the products of the premises had not been accounted for, and that such as had been taken from the premises and disposed of had been so disposed of at less than its market value; averring further that, on a proper accounting it would be found that the lessee had been fully paid all that was due him under the lease. They prayed an accounting, and further prayed that they have judgment for such sum as should be found due them, and that the court adjudicate the lease to be at an end.

Issue was taken on the affirmative matter in the answer, and a trial had before the court as of a cause of equitable cognizance. The trial judge made no formal findings of fact, but filed a written opinion in the cause in which he stated in a general way his findings and conclusions. The findings, in substance, sustained the lessee's contention that he had farmed the premises in the manner required by the lease, and that he had faithfully accounted for all of the produce

raised upon the place. Because, however, of the lessee's admission that he had failed to irrigate certain hay land in one season, he was chargeable with a loss of $216 on account thereof. The evidence disclosed that the part of the orchard sold to Roberts produced during the years 1921 and 1922 marketable apples grossly in excess of the practically equal quantity retained and cared for by the lessee, and based on this fact the judge allowed a credit to the lessors over and above the amount credited by the lessee in the sum of $2,500. He found that the sum remaining due to the lessee under the terms of the lease as shown by his account was $10,529.65; from this he deducted the items above mentioned, leaving a balance of $7,813.65. Nothing is said in the opinion with reference to the amount claimed to be due on account of payments made by Roberts on the mortgage note.

The decree adjudicated, in substance, that there had been no forfeiture of the lease; that there remained due the lessee the sum of $7,813.65, and that the lessee was entitled to retain possession of the premises and till and farm the same until this sum had been either paid to him or derived from the products of the leased land; that he was entitled to a personal judgment against the lessors on account of the payments received from Roberts during the years 1921 and 1922 in the sum of $1,856.78, providing, however, that this sum should be credited on the amount remaining due under the terms of the lease on its payment; decreeing further, that the lessee was entitled to recover his costs and disbursements expended in the prosecution of his suit. The lessors appeal.

The first assignment of error to be noticed involves the construction of the contract of lease. It will be observed from the first paragraph of the lease, which we have quoted, that the lessee shall have possession

of the leased premises from and after a time stated, and shall ''at their own cost and expense in a husband-like and proper manner prune, spray, irrigate and care for all fruit trees now growing upon the premises, and furnish all teams, tools, material and labor for the purpose, . . . '' It will be observed, furthermore, that the provision relating to the cost and expense is not contained in the other provisions of the contract wherein the duties of the lessee as to other parts of the leased premises are defined.

It is the contention of the lessors that these provisions of the contract mark a distinction between costs and expenses which the lessee is entitled to charge back to the lessors and those which he is not; that a distinction is made in this respect between the costs and expenses of caring for the fruit trees and the cost and expenses incurred and expended in the performance of the other work required by the terms of the lease. But we agree with the trial court that the terms of the lease as a whole negative such a construction. Elsewhere in the lease, particularly in those parts of it wherein the lessee is required to keep accurate accounts of his expenditure and receipts, no distinction is made between the expenses of caring for the fruit trees and the expenses of performing other parts of the work. In those parts of the contract, the expenses as well as the proceeds from the crops are spoken of as a whole. In the fifth paragraph of the lease, also the paragraph that contains the provisions relating to the guarantee, the references are to the ''net income.'' These provisions, manifestly, are contrary to the thought that only a part of the expenses were to be deducted in ascertaining the income. The lessors furthermore had access to the accounts. They knew the manner in which they were kept, and knew that from the beginning the lessee was charging to them all of

the expenses of caring for the land, yet they made no objection thereto until about the time of the commencement of the present action. This is a contemporaneous construction of the contract, furnishing persuasive evidence that the construction put upon the contract by the court is in accordance with the understanding of the parties. We think we need not review the many cases cited by counsel as bearing on the question. In so far as they are applicable to the situation they state general principles only, with none of which we are in dispute. A review of them, therefore, would be only an attempt to show their inapplicability, in no way enlightening.

As to the other branch of the case, we are not in so full an accord with the trial judge's conclusion. In his memorandum opinion before mentioned, the trial judge stated that the books of account kept by the lessee were complete and detailed, and that there was not "a scintilla of evidence to impeach in any manner a single item on the question of the amount produced or the price received therefor." In so far as the books themselves are concerned, we find nothing to dispute the fact that they were properly kept and correctly show the amount of produce reported, the disposition made of it, and the prices received therefor. But this does not meet the point to which the lessors directed their evidence. Their claim is that the lessee's accounts do not show all the products actually grown and harvested upon the premises, and show nothing of the losses caused by the negligent care of the premises. As an illustration, certain of the hay crops may be mentioned. In the year 1919, the hay was harvested and stacked upon the land. While in the stacks it was measured by one of the lessors, assisted by a neighbor, according to an approved rule. The stacks were found

to contain 240 tons, and approximately this quantity was reported by the foreman in charge of the premises, who knew nothing of the measurement, to the officers of the United States Reclamation Service, yet the lessee accounted for only 131.56 tons. In 1920, the lessor again measured the hay while it was in the stack, finding 250 tons. This quantity was likewise reported to the reclamation service as the quantity grown thereon, by the lessor's son, who had charge of the place for the lessor, yet the lessee accounted for only 140 tons.

It is true, the trial judge gave no heed to these measurements and these reports, saying: "But we know there are many methods of measuring hay and the only true criterion of obtaining exact weights is by having the hay baled and weighed, and between the two methods there is no question but that the court should find that, where one party has had the hay baled and weighed and another party has made measurements of the stacks in the field before they are weighed, the results of the former process must be binding on the court."

The conclusions here drawn are unquestionably just, but we can find no support in the evidence for the facts from which the conclusions assume. The hay crop for the year 1918 was partly baled and weighed, but the baling was done in midwinter, after the stacks had stood exposed to the weather for a number of months, and only that part was baled which would pass as merchantable. It is common knowledge that exposed stacks of hay deteriorate under such conditions, and here there was evidence that the hay had been poorly stacked and a greater loss than is usually to be expected was suffered.

We cannot, however, accept the principle that this method of treating the hay is the good husbandry the

lease required. Seemingly, good husbandry would require that the hay be either protected from the elements or baled and disposed of in a more propitious season. As to the second crop mentioned, there is no evidence that· the hay was baled or weighed at all. One hundred tons of it were sold by the lessee to himself for uses on other of his farms, and 40 tons to a Mr. McEwan. None of it is reported as baled or weighed, and it would seem that the measurements by the one party would furnish as accurate a test of quantity as would measurements by the others.

Similar testimony of waste and improper care is given with reference to other products of the premises. Something of its nature with reference to the fruit crops we have hereinbefore stated, and we do not feel that we need pursue the inquiry further. While we cannot accept the estimates given by the lessors testifying as to the extent of the losses occasioned by the lessee's want of care of the premises and its products, we do think the evidence justifies a greater charge against the lessee's account than that made by the trial court.

The lessee has had the use of the premises for five successive crops. He neither pays the taxes nor the water rents. For the last two years he has paid no rent. His books show that there is now due on account of the lease $10,529.65, whereas the original obligation was only $11,200, plus the rent of the premises for three years. It is plain that, unless he is held to a somewhat strict accountability, his lease will be perpetual; that he will enjoy all the benefits of ownership without its principal burdens. But while, as we say, we cannot accept the lessors' estimates of their losses, caused by the lessee's inattention, we think they have an evidentiary value greater than the trial court allowed to them. In our opinion, it is well within the

evidence to reduce the amount of the lessee's claims to $5,000.

The cause is remanded with instructions to conform the decree to this requirement—in other respects it will stand affirmed. The lessors will recover their costs of appeal.

MAIN, C. J., BRIDGES, MITCHELL, and PEMBERTON, JJ., concur.